| | |
|---|---|
| CHESTER BIRCHEAT,<br><br>     Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND HUMAN SERVICES,<br><br>     Respondent. | Chief Special Master Corcoran<br><br>Filed: June 16, 2021<br><br>Special Processing Unit (SPU); Decision Awarding Damages; Pain and Suffering; Influenza (Flu) Vaccine; Guillain-Barré syndrome (GBS) |

*Leah VaSahnja Durant, Law Offices of Leah V. Durant, PLLC, Washington, DC, for Petitioner.*

*James Vincent Lopez, U.S. Department of Justice, Washington, DC, for Respondent.*

## DECISION AWARDING DAMAGES[1]

On July 29, 2019, Chester Bircheat filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"), alleging that he suffered Guillain Barré syndrome ("GBS") as a result of an influenza ("flu") vaccination administered to him on November 8, 2017. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters. Although entitlement was conceded, the parties could not agree on damages, so the disputed component of actual pain and suffering was submitted to SPU Motions Day.

---

[1] Because this unpublished decision contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

For the reasons described below, and after holding a brief hearing on damages in this matter, I find that Petitioner is entitled compensation, and I award damages in the amount $170,000.00, representing compensation for Petitioner's actual pain and suffering.

I.   **Relevant Procedural History**

As noted above, the case was initiated in July 2019. On July 29, 2020, Respondent filed a Rule 4(c) report in which he conceded that Petitioner was entitled to compensation in this case. ECF No. 16. Accordingly, on July 30, 2020, a ruling on entitlement issued finding Petitioner entitled to compensation for GBS. ECF No. 17. After attempting to informally resolve the issue of damages for several months, the parties informed me in January 2021 that they could not do so. ECF No. 26. I therefore provided the parties an opportunity to file written briefs, and scheduled this matter for an expedited hearing and ruling. ECF Nos. 27, 36.

The hearing was held on May 28, 2021, and the only disputed damages component was pain and suffering.[3] Petitioner requests that I award him $225,000.00 for past pain and suffering. ECF Nos. 31, 35. Respondent proposes that I award the lesser amount of $128,000.00 for actual pain and suffering. ECF No. 32. The parties agreed to an award of $558.64 representing Medicaid lien expenses. ECF No. 35 at 1-2 n.1.

II.  **Legal Standard**

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment awarding such expenses which-- (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Human Servs.*, No. 04-

---

[3] The transcript of the May 28, 2021 Hearing in this case was not yet filed as of the date of this Decision but is incorporated by reference herein. Leah Durant appeared on behalf of Petitioner, and James Lopez appeared on behalf of Respondent.

2

1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Human Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

Prior pain and suffering awards in comparable cases also bear on the findings reached herein. *See, e.g.*, *Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with my predecessor Chief Special Masters) adjudicating similar claims.[4] *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

### III.    Appropriate Compensation in this Case

In this case, awareness of the injury is not disputed. The record reflects that at all times, Petitioner was a competent adult with no impairments that would impact his awareness of his injury. I thus analyze principally the severity and duration of Petitioner's injury.

In performing this analysis, I have reviewed the record as a whole to include the medical records and affidavits filed and all assertions and argument made by the parties in written documents and at the expedited hearing held on May 28, 2021. I also considered prior awards for pain and suffering in both SPU and non-SPU GBS cases, and rely upon my experience in adjudicating those cases.[5] However, I ultimately base my

---

[4] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of SIRVA claims, were assigned to former Chief Special Master Dorsey, now Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

[5] Statistical data for all GBS cases resolved in SPU by proffered amounts from inception through January 1, 2021 reveals the median amount awarded to be approximately $167,499.14. These awards have typically ranged from approximately $128,072.42 to $269,933.00, representing cases between the first and third quartiles.

3

determination on the circumstances of this case.

Here, the record shows that Petitioner, a retiree with significant co-morbidities,[6] presented on December 4, 2017 (approximately 27 days after this flu vaccination) to his primary care physician with complaints of a four-day history of progressive weakness and numbness in his extremities, and an inability to walk. Ex 2 at 17. He was admitted to the hospital that same day and assessed with "possible acute inflammatory polyneuropathy" or GBS "due recent inf[ection] or vaccination" after a December 6, 2017 nerve conduction study demonstrated "severe demyelinating polyneuropathic findings." Ex. 5 at 1911-12.

Petitioner was treated "empirically due to severe symptoms and weakness" and a five-day course IVIG therapy commenced. Ex. 5 at 1912. He suffered a fairly severe injury and had a difficult rehabilitation course. After seven days in the hospital, Petitioner was discharged on December 11, 2017 to in-patient rehabilitation where he remained until January 4, 2018. Ex. 11 at 4. It was noted that Petitioner had no symptom improvement after completion of a five-day course of IVIG. Ex. 11 at 6, 35-36. On December 18, 2017 after experiencing severe dysphagia with aspiration Petitioner required the surgical insertion of a jejunostomy feeding tube. Ex. 8 at 7-8; Ex. 11 at 6. During his in-patient rehabilitation, Petitioner underwent physical, occupational, and speech therapy in an effort to improve his mobility, independence in regard to conducting activities of daily living, and safety. Ex. 11 at 6, 23. Petitioner was discharged from rehabilitation treatment on January 4, 2018 to live at home with his niece. Ex. 11 at 4, 10.

Thereafter Petitioner was treated for his GBS (and other medical conditions) regularly for more than two and a half years. Petitioner engaged in outpatient therapy for approximately two months completing 21 physical therapy sessions, eight occupational therapy sessions, and five speech therapy sessions. Ex. 4 at 514-15, 631, 690-93. Unfortunately, even two years subsequent to his initial hospitalization in December 2019, Petitioner reported to his primary care provider that he had "increased pain all over feel[s] like walking on blisters," and he was "worried" his GBS was returning due to his "severe needle pain." Ex. 18 at 17. At that time, Petitioner's primary care physician's assessment of his condition included "neuropathy, severe, BLE [secondary to] Guillain Barre." *Id.* at 16.

---

[6] Petitioner received his vaccination (Ex 1; Ex. 16 at 1) while he was at an in-patient rehabilitation program (from 11/7/17 – 11/20/17) recovering from severe pneumonia and acute hypoxemic respiratory failure following a nine-day hospitalization (10/30/2017 – 11/7/2017). Ex. 3 at 1-2; Ex. 5 at 1-3. Petitioner's comorbidities included: chronic pain, chronic tremor, generalized weakness, depression, hypertension, chronic obstructive pulmonary disease, chronic back problems, coronary artery disease, hiatal hernia, and gastroesophageal reflux disease. Ex. 3 at 1, 5; Ex. 11 at 34. Prior to his GBS diagnosis Petitioner took narcotic medications for his chronic neck and back pain. *See generally* Ex. 2. Additionally, Petitioner suffered pre-vaccination symptoms in 2017 of numbness, paresthesia, "pins and needle" pain in his extremities. Ex 2 at 18-26; Ex. 6 at 12.

However, by August 5, 2020, Petitioner reported at a telehealth neurology appointment that he was doing well, and that his "paresthesia and dysesthesias have been more or less well controlled on the current medical regimen." Ex. 19 at 6. He further indicated that his activities of daily living and his quality of life were "not affected." *Id.* He remained on Neurontin in addition to other medications. *Id.* Shortly thereafter, on September 4, 2020, Petitioner underwent EMG testing demonstrating "[m]ild electrophysiologic evidence of nonspecific sensory and motor peripheral neuropathy of the tested nerves, improved versus the April 4, 2018 study" and "[n]ormal EMG of the lower extremities as tested." Ex. 19 at 16. While Petitioner had not yet completely recovered from his GBS, at that point (two years and nine months after his initial hospitalization), I find that his GBS and related sequela had significantly improved. No further treatment records have been filed.[7]

In making my determination, I have fully considered Petitioner's own affidavit, as well as a signed statement from his niece, which describe the pain experienced by Petitioner over the course of his injury, as well as, the limitations in his exercise of daily functions and physical activities attributed to his GBS. Both Petitioner and his niece report that he has not returned to his prior level of functioning. Exs. 16, 21.

As I informed the parties during the expedited hearing, the question in this case is not whether Petitioner is entitled to *any* compensation for his pain and suffering, but rather *what* amount of compensation is justified, based upon the facts of the case. This determination is not an exact science but more of an art. While it is tempting to "split the difference" and award an amount halfway between the amounts proposed by the parties (based upon the determination that the parties' respective positions reasonably "frame" high and low potential awards), each petitioner deserves an examination of the specific facts in his or her case. Thus, while amounts ultimately awarded may end up falling somewhere in the range between the awards proposed by both parties, this result flows from a specific analysis of Petitioner's personal circumstances.

Based upon the record as a whole, I find that the severity and duration of Petitioner's GBS symptoms warrant a significant pain and suffering award, but not quite at the level requested by Petitioner.

In his brief, Respondent references three prior GBS damages decisions and argues that Petitioner's clinical course was less severe than the petitioners in those cases. Rather, based on his review of other conceded (and presumptively proffered) flu/GBS cases, Respondent deems $128,000.00 to be an appropriate award of pain and suffering in this case. ECF No. 32 at 13-14 (citing *Johnson v. Sec'y of Health & Human*

---

[7] The record does document a further neurology appointment on September 22, 2020 for cerebral thrombosis with cerebral infraction. Ex. 19 at 3.

*Servs.*, No. 16-135V, 2018 WL 5024012 (Fed. Cl. Spec. Mstr. July, 20, 2018) (awarding $180,000.00 for actual pain and suffering); *Dillenbeck v. Sec'y of Health & Human Servs.*, No. 17-428V, 2019 WL 4072069 (Fed. Cl. Spec. Mstr. July 29, 2019) *aff'd in relevant part and remanded on other grounds* 147 Fed. Cl. 131 (2020) (awarding $170,000.00 for past pain and suffering); *Fedewa v. Sec'y of Health & Human Servs.*, No. 17-1808V, 2020 WL 1915138 (Fed. Cl. Spec. Mstr. March 26, 2020) (awarding $180,000.00 for past pain and suffering)).

Petitioner in reaction argues that the *Dillenbeck* and *Johnson* cases present "far less severe fact patterns than the present case." ECF No. 35 at 6. He has not, however, offered comparable reasoned decisions of his own. Instead he cites to two cases that were conceded and resolved via Proffer (resulting in pain and suffering awards of $200,000.00 and $225,000) as agreed upon by the parties. ECF No. 31 at 13.

I reject the implied argument of both parties that the amounts awarded in proffered cases provide more persuasive guidelines for the award to be issued in this matter than reasoned decisions from the Court and special masters. As I have previously stated, a proffer is simply Respondent's assessment (as agreed to by Petitioner) of the appropriate amount to be awarded, and thus a special master's approval of a proffer is not akin to a reasoned evaluation of damages, issued by a neutral judicial officer, that can be looked to when evaluating the damages to be awarded – even if settled cases and proffers do provide *some* evidence of the magnitude of awards in factually-similar actions.

Moving to the relevant facts, Petitioner argues that his comorbidities support a higher award, as his other conditions were made worse and his suffering greater as a result of his GBS, and notes "a general principle of tort law is that the defendant must take his plaintiff as he finds him." ECF No. 31 at 12. However, Respondent offers the counter argument that Petitioner's comorbidities support a lower award, as his pain and suffering was not solely due to his GBS, as was true in cases cited by Respondent involving previously-healthy individuals whose medical condition greatly worsened due to vaccine injury. ECF No. 32 at 12-14.

I generally agree with Petitioner that the mere fact a claimant had pre-vaccination comorbidities does not per se diminish the impact of injury on his life – especially one as alarming and potentially life-altering as GBS – and therefore is not alone a reason for a lower award. However, those comorbidities are still relevant to pain and suffering, since their ongoing nature means that not all of his post-vaccination suffering can in fact be attributed to the vaccine injury.

In addition, while Petitioner argues that his continued symptoms support an increased award and "that there is no hope in sight for a full recovery", ECF No. 31 at 12,

the petitioner in *Dillenbeck* (who received less than what Petitioner requests herein) similarly "did not feel like she had returned to a baseline level of health" even three years after vaccination. *Dillenbeck,* 2019 WL 4072069, at *2. And unlike some petitioners, whose GBS ends their working careers,[8] Petitioner was retired. Even if Petitioner's GBS and related sequela had a considerable impact on his life enjoyment, the non-vaccine-caused co-morbidities he was experiencing also affected his life. Finally, as pointed out by Respondent at the expedited hearing, Petitioner did not require a life care plan to provide for future medical care and needs related to his GBS – thus further highlighting the degree to which his suffering, while real, is not associated with the need for continued medical intervention.

I find the cases referenced by Respondent (*Johnson*, *Fedewa*, and *Dillenbeck*) provide reasonable benchmarks for an award of pain and suffering in the instant case, notwithstanding the real differences in the course of each petitioners' injury. As I explained previously to the parties during the expedited hearing, it is my view that GBS pain and suffering awards generally should be higher than those awarded to petitioners who have suffered a less frightening and physically-alarming injury, such as SIRVA. After reviewing the record and specific facts in this case and considering the parties' arguments during the hearing, I find that $170,000.00 in compensation for past pain and suffering is reasonable based on the facts and circumstances specific to this case. This sum exceeds the amount that Respondent proposed, but is properly less than what Petitioner requested, and fits the range of sums awarded in the three good comparable cases.

## IV. Conclusion

For all of the reasons discussed above, and based on consideration of the record as a whole, I find that $170,000.00 represents a fair and appropriate amount of compensation for Petitioner's past pain and suffering, and $558.64 as agreed to by the parties for reimbursement of Petitioner's Medicaid lien.

**Accordingly, I award the following compensation**:

a. A lump sum payment of $558.64, representing compensation for satisfaction of a State of Alabama Medicaid lien, payable jointly to Petitioner and

HMS<br>
TPL Recovery Unit<br>
4121 Carmichael Road, Suite 205

---

[8] *See, e.g.*, *Dillenbeck,* 2019 WL 4072069, at *14.

Montgomery, AL 36106

Petitioner agrees to endorse this payment to the State; and

b. A lump sum of $170,000.00, representing compensation for Petitioner's actual pain and suffering, in the form of a check payable to Petitioner.

This amount represents compensation for all items of damages that would be available under Section 15(a).

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master